United States Court of Appeals,

Eleventh Circuit

No. 95-4769.

UNITED STATES of America, Plaintiff-Appellee,

v.

Alice SEPULVEDA and Placido Mendez, Defendants-Appellants.

June 20, 1997.

Appeals from the United States District Court for the Southern District of Florida. (No. 94-327-CR-JLK, James Lawrence King, Judge.

Before TJOFLAT and EDMONDSON, Circuit Judges, and O'NEILL[*], Senior District Judge.

THOMAS N. O'NEILL, Senior District Judge:

Appellants Alice Sepulveda and Placido Mendez were convicted of possessing and conspiring to possess, with intent to defraud, fifteen or more unauthorized access devices in violation of 18 U.S.C. § 1029(a)(3). Their convictions rested on evidence that they possessed fourteen "cloned" cellular telephones programmed to charge unauthorized calls to subscribers' accounts and four unprogrammed numerical combinations corresponding to additional accounts. Appellants contend that they are entitled to acquittal because the unprogrammed combinations are not additional access devices that can be added to the fourteen cloned telephones to establish the fifteen or more access devices required for conviction. We find that the unprogrammed combinations constitute access devices within the meaning of § 1029. We therefore affirm the judgments of conviction.

Appellants also challenge the increased sentences they received based on the district court's determination that their conduct caused losses of $42,124.32. Because we conclude that uncertainties in the loss analysis precluded a finding by a preponderance of the evidence that the losses exceeded $40,000 as required by United States Sentencing Guidelines § 2F1.1(b)(1)(F), we reverse the district court's application of that provision and remand for resentencing.

---

[*]Honorable Thomas N. O'Neill, Jr., U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

I.

Federal agents arrested appellants on June 2, 1994 after executing a search warrant at a clothing store where, it was established at trial, appellants operated a "call sell" service using "cloned" cellular telephones. Store clerks would escort a customer to one of several dressing rooms that served as telephone booths, dial the requested number, hand the customer a cellular telephone, and charge the customer by the minute for the call. Upon searching the clothing store the agents seized fourteen cellular telephones[1] and ledgers listing hundreds of callers' names and the locations they had called. A customer of the call sell service testified that she placed calls from appellants' store two to three times per week between January and May, 1994 and that each time there were "many people waiting" to place calls.

Experts testified that a cellular telephone, when dialed, emits both an eight-digit Electronic Serial Number, or ESN, and a ten-digit Mobile Identification Number, or MIN, both of which are stored on the cellular telephone's internal microchip.[2] Emission of the ESN-MIN combination ("ESN-MIN") results in charges against the subscriber account bearing the same numbers. "Cloning" involves reprogramming the microchip to emit an illegitimately obtained ESN-MIN and thus to charge unauthorized calls to the corresponding account.[3] The procedure requires a personal

---

[1]The trial court suppressed evidence of three additional telephones seized from the trunk of Sepulveda's car.

[2]The ESN is the instrument identifier inscribed on the microchip by the manufacturer. The MIN, which usually corresponds to the subscriber's area code and telephone number, is assigned by the cellular service provider and is programmed onto the microchip when the subscriber's account is activated.

[3]Cloning, which illicitly charges a specific account, is distinct from "tumbling," which "free rides" on the cellular telephone system by emitting random ESN-MINs which are changed before the system can identify them as invalid. *See United States v. Brady,* 13 F.3d 334, 336 (10th Cir.1993). Because the ESN-MINs in this case corresponded to individual accounts, cases excluding tumbling cellular telephones from § 1029 on the grounds that they do not access "distinct identifiable accounts" are inapposite. *See id.* at 339-40; *United States v. Morris,* 81 F.3d 131, 134 (11th Cir.1996) (noting in dictum that § 1029 should not be extended beyond "devices which access an individual account"); *but see United States v. Ashe,* 47 F.3d 770, 774 (6th Cir.) (holding that "invasion of an identifiable customer's account is not a necessary element of proof"), *cert. denied,* --- U.S. ----, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995); *United States v. Bailey,* 41 F.3d 413, 418 (9th Cir.1994) (holding that § 1029 extends to "tumbling" because such activity incurs charges between cellular carriers and § 1029 "nowhere implies that the only "account' protected against improper "access' is one maintained by an end consumer"), *cert.*

computer, specialized software and cables connected to the telephone's microchip. In a process that takes approximately thirty seconds to three minutes the ESN-MIN is typed into the computer which then transcribes the numbers to the microchip. Thereafter the telephone emits the unauthorized ESN-MIN and illicitly charges the unsuspecting subscriber each time it is dialed. By using a device that "reads" a telephone's ESN-MIN emissions and comparing those emissions to cellular telephone company records the government established that the telephones seized from appellants were cloned.

In addition to the fourteen cloned cellular telephones, the agents seized a piece of paper bearing four handwritten ESN-MIN combinations which corresponded to four additional subscribers' accounts.[4] A government witness testified that until transcribed by a computer to a microchip such unprogrammed combinations could not be used to place calls. No such computer or other cloning equipment was found at appellants' store. Testimony from cellular telephone company representatives established that some of the unprogrammed ESN-MINs had in fact been used to place unauthorized calls.

Appellants, emphasizing that the handwritten ESN-MINs in their unprogrammed form were incapable of obtaining access to cellular telephone accounts, moved for acquittal on the grounds that the evidence failed to establish the requisite fifteenth access device. The district court denied the motions and the jury returned verdicts of guilt. After their post-trial motions were denied appellants appealed. We review the district court's denial of a motion for judgment of acquittal *de novo*. *United States v. Kelly,* 888 F.2d 732, 739 (11th Cir.1989).

## II.

Appellants were convicted of violating and conspiring to violate 18 U.S.C. § 1029(a)(3), which proscribes possession, with intent to defraud, of "fifteen or more ... counterfeit or unauthorized access devices." § 1029(a)(3). An access device is defined as "any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with

---

*denied,* --- U.S. ----, 115 S.Ct. 2563, 132 L.Ed.2d 815 (1995).

[4]Cellular telephone company representatives testified that both the handwritten ESN-MINs and the ESN-MINs programmed in the seized telephones were assigned to legitimate customers who had not authorized appellants' use thereof.

another access device, to obtain money, goods, services, or any other thing of value...."  §

1029(e)(1).[5]

Appellants do not dispute that their possession of fourteen cloned telephones programmed

for immediate transmission of unauthorized ESN-MINs established possession of fourteen

unauthorized access devices.  Appellants contend, however, that the four unprogrammed ESN-MINs

are not additional access devices because they must be transcribed through a computer before being

transmitted to place cellular telephone calls.  According to appellants, the need for the computer

precludes a finding that the unprogrammed ESN-MINs "can be used ... in conjunction with another

access device" to obtain cellular telephone service, both because the computer is not an access

device and because no such computer was found in appellants' possession.[6]

A.

The ESN-MINs, which are account-identifying information like the "codes" and "account

numbers" enumerated in § 1029(e)(1), constitute a "means of account access" under § 1029(e)(1).[7]

Similarly, cellular telephone microchips, which serve as a medium for storing and transmitting this

account information, are sufficiently analogous to the "cards" and "plates" used to store and convey

other types of account information to constitute another "means of account access" under §

_____

[5]An amended provision that took effect after appellants were indicted includes any "electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier."  *See* Pub.L. No. 103-414, 108 Stat. 4279 (codified as amended at 18 U.S.C. § 1029(e)(1)(1994)).  Appellants argue that because the amended version, which does not govern this case, explicitly includes ESNs and MINs and because amendments are presumed to have a "real and substantial effect," *Stone v. I.N.S.,* 514 U.S. 386, ----, 115 S.Ct. 1537, 1545, 131 L.Ed.2d 465 (1995), the prior version should be read to exclude ESN-MINs.  Congress may, however, "amend a statute to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases.  Thus, an amendment to a statute does not necessarily indicate that the unamended statute meant the opposite." *Hawkins v. United States,* 30 F.3d 1077, 1082 (9th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995).  We find the subsequent amendment inconclusive and analyze the applicable statute based on its plain language and legislative purpose.

[6]It is undisputed that the unprogrammed ESN-MINs could not be used "alone" to place cellular telephone calls.

[7]Appellants argue that the unprogrammed ESN-MINs are not access devices but do not dispute that they are a means of account access.

1029(e)(1).[8]  While it is undisputed that the ESN-MINs, once programmed onto microchips, can be used in conjunction with microchips to obtain cellular telephone services, appellants contend that because such ESN-MINs must be used in conjunction with a computer, which is not an access device, they cannot be used in conjunction with another access device within the meaning of § 1029. Appellants' argument misconstrues the plain statutory language.

The statute does not define the concept of use in conjunction with another access device. Terms that are not statutorily defined are ascribed their "ordinary or natural meaning." *National Coal Ass'n v. Chater,* 81 F.3d 1077, 1081 (11th Cir.1996) (per curiam) (citing *Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994)); *United States v. Myers,* 972 F.2d 1566, 1572 (11th Cir.1992).[9]  The statutory definition of access device extends to "any" means of account access that "can be used ... in conjunction" with another access device to obtain goods or services.  The ordinary and natural meaning of this language includes any means of account access that can be brought together with another access device and used in combination therewith for the common purpose of obtaining goods or services.  *See* WEBSTER'S THIRD INTERNATIONAL DICTIONARY 479 (15th ed. 1968) (defining "conjunction" as a "state of being conjoined," which is in turn defined as "joined together for a common purpose or a common end").

Thus the plain statutory language requires only that a means of access be able to be combined with and used together with another access device to obtain services.  Under this language the use of an additional item which is not itself an access device to bring two items together or to facilitate their use in conjunction with one another does not preclude a finding that the two items can be used in conjunction with one another to obtain goods or services.

---

[8]*See Newsom v. Friedman,* 76 F.3d 813, 819 (7th Cir.1996) (holding that, under statutory construction principles of ejusdem generis and noscitur a sociis, general terms following a series of more specifically enumerated terms refer to items similar in structure and function to the enumerated terms).

[9]Because Congress is " "not required to define each and every word in a piece of legislation in order to express clearly its will' " a statute is not ambiguous merely because it contains a term without a statutory definition.  *Newsom v. Friedman,* 76 F.3d 813, 817 (7th Cir.1996) (quoting *Gardner v. Brown,* 5 F.3d 1456, 1459 (Fed.Cir.1993), *aff'd,* 513 U.S. 115, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994)).

We " "must give effect to this plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning.' " *McNely v. Ocala Star-Banner Corp.,* 99 F.3d 1068, 1073 (11th Cir.1996) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983)), *cert. denied,* --- U.S. ----, --- S.Ct. ----, --- L.Ed.2d ----, 65 U.S.L.W. 3587 (U.S. May 19, 1997) (No. 96-1318).  We find no reason to believe Congress intended a more restrictive meaning than the plain language of § 1029 denotes.[10]  While criminal statutes must be strictly construed, this canon "is not an inexorable command to override common sense and evident statutory purpose....  Nor does it demand that a statute be given the "narrowest meaning;'  it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers." *United States v. Moore,* 423 U.S. 122, 145, 96 S.Ct. 335, 347, 46 L.Ed.2d 333 (1975) (quoting *United States v. Brown,* 333 U.S. 18, 25-26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948));  *see also United States v. Parker,* 749 F.2d 628, 632 (11th Cir.1984) (holding that "while penal statutes are to be strictly construed, the courts are not required to abandon common sense").[11]

A common sense, practical reading of the plain language of § 1029 encompasses any means of account access that can be combined with another access device and used in conjunction

---

[10]As other courts construing § 1029 have noted, Congress drafted the statute broadly to address the "misuse of account numbers" without regard to the particular mechanics or technologies involved in such conduct.  *See United States v. Caputo,* 808 F.2d 963, 966 (2d Cir.1987) (citing S.Rep. No. 98-368 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3647 and holding that § 1029 is aimed at misuse of accounts regardless of the "particular medium" on which account information is stored);  *see also United States v. McNutt,* 908 F.2d 561, 563 (10th Cir.1990) (quoting H.R.Rep. No. 98-894 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182 and noting that Congress "sought to include in its definition of access devices ... "other methods of obtaining goods and services' ");  *United States v. Brewer,* 835 F.2d 550, 553 & n. 1 (5th Cir.1988) (quoting S.Rep. No. 98-368 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182 and H.R.Rep. No. 98-894, *reprinted in* 1984 U.S.C.C.A.N. 3689 and noting that § 1029 was " "intended to be broad enough to encompass technological advances' ").

[11]Appellants urge a narrow interpretation of § 1029 based on the rule of lenity.  *See United States v. Witek,* 61 F.3d 819, 822 (11th Cir.1995) (holding that under rule of lenity ambiguities in criminal statutes must be construed in favor of the accused), *cert. denied,* --- U.S. ----, 116 S.Ct. 738, 133 L.Ed.2d 688 (1996).  This rule, however, has no application where the fair meaning of the statute is clear;  it " "comes into operation at the end of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.' " *United States v. Elgersma,* 971 F.2d 690, 695 n. 13 (11th Cir.1992) (quoting *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961)).  Because the statutory language in this case is unambiguous the rule of lenity does not apply.

therewith to obtain goods or services. Read in context the phrase "alone or in conjunction with another access device" does not restrict the reach of § 1029 to means of account access that require nothing more than one other access device in order to obtain immediate account access, but rather extends the definition of access device to any means of account access that can be used to obtain goods or services regardless of whether the means of access is alone sufficient to complete the transaction or whether it must be used in conjunction with another access device to do so. Because nothing in the statutory language requires that a means of account access be immediately capable of use solely, exclusively or directly in conjunction only with one other access device, we decline to impose such a requirement. *See McNely,* 99 F.3d at 1074, 1077 (holding that "importing the term "solely' ... is not warranted under the statute's plain language" which should be construed as "no more restrictive ... than the ordinary, everyday meaning of the words would be understood to imply"); *see also Nguyen,* 81 F.3d at 914 (holding that appellant's "argument that a card without a number cannot gain access to an account simply misperceives the plain language of the statute").[12]

Only by construing the "in conjunction" language restrictively to require immediate, direct and exclusive conjunction can appellants contend that two means of account access are not capable of use in conjunction with one another merely because a third item, which is not an access device, is used to combine the two means of account access for use in conjunction with one another. The statutory language does not support this construction. We therefore conclude that the unprogrammed ESN-MINs, which can be used in conjunction with microchips to obtain cellular telephone services, are not excluded from the statutory definition of access device merely because

---

[12]Criminal statutes must provide an "ordinary person with ... clear notice" of what is prohibited. *Daniel v. City of Tampa,* 38 F.3d 546, 550 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 2557, 132 L.Ed.2d 811 (1995). Section 1029 affords clear notice that it includes "any" means of account access that can be used in conjunction with another access device and would not lead an ordinary person to believe that the statute includes only means of access that require no additional items to link them to another access device for use in conjunction therewith. The requirements that the means of account access be "counterfeit or unauthorized" and be possessed "with intent to defraud" further eliminate any risk that § 1029 could be violated unknowingly. *See United States v. Brewer,* 835 F.2d 550, 553 (5th Cir.1987) ("a practical reading of [§ 1029] "provides a person of ordinary intelligence a reasonable opportunity to know what is proscribed' ").

a computer which is not an access device is used to transfer such ESN-MINs to the microchips.[13]

B.

We turn now to appellants' contention that, without proof that appellants possessed the computer equipment needed to transcribe the ESN-MINs, the evidence failed to establish that the unprogrammed ESN-MINs could actually be used to obtain cellular telephone services. We do not agree because the evidence viewed as a whole would permit a reasonable factfinder to conclude that the ESN-MINs were in fact realistically and foreseeably capable of being used to obtain cellular telephone services.

In assessing the sufficiency of the evidence we must view it in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor. *United States v. Lyons,* 53 F.3d 1198, 1200 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 350, 133 L.Ed.2d 246 (1995). To sustain a verdict of guilt the evidence "need not exclude every reasonable hypothesis of innocence" or be "wholly inconsistent with every conclusion except that of guilt," as long as a reasonable factfinder choosing from among reasonable constructions of the evidence could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Kelly,* 888 F.2d 732, 740 (11th Cir.1989). This standard of review applies to both direct and circumstantial evidence. *United States v. Ismoila,* 100 F.3d 380, 387 (5th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 1712, --- L.Ed.2d ---- (1997).

While appellants are correct that unprogrammed ESN-MINs in isolation cannot be used to obtain cellular telephone services, the evidence in this case established that appellants did not possess the ESN-MINs in isolation. According to undisputed evidence appellants also possessed numerous devices used to store such ESN-MINs and transmit them to obtain cellular telephone

---

[13]The fact that the computer is only used initially to combine the two means of account access, which thereafter can be used immediately and exclusively in conjunction with one another to access cellular subscribers' accounts, further supports the conclusion that the ESN-MINs are means of account access that can be used in conjunction with another access device to obtain services. Thus even if the computer constitutes "device-making equipment" under § 1029(e)(6) as appellants contend, the computer's role in facilitating the use of ESN-MINs in conjunction with microchips does not alter the fact that the ESN-MINs can be used in conjunction with microchips to obtain cellular telephone services.

service. Moreover, appellants were emitting numerous other such unauthorized ESN-MINs to place cellular telephone calls and had done so extensively over a period of months.[14]

Experts testified that whereas legitimate ESNs and MINs are programmed into microchips by cellular telephone manufacturers and service providers, unauthorized ESN-MINs such as those appellants were using must be illicitly programmed using cloning equipment. The testimony further revealed that an unauthorized ESN-MIN can be used only until the legitimate subscriber detects and reports the unauthorized use. When viewed favorably to the government as it must be in assessing the sufficiency of the evidence, *see Lyons,* 53 F.3d at 1200, this testimony supports the inference that appellants could not have sustained their high-volume unauthorized calling operation over an extended period without regularly identifying and activating new unauthorized ESN-MINs.

The expert testimony further established that, although cloning requires special software and accessories to link a personal computer to a cellular telephone's microchip, the process can be accomplished within thirty seconds to three minutes. From this testimony a reasonable jury could infer that the process could be completed quickly and discreetly in many locations without complex technology or highly specialized skills, and thus would have been readily accessible to persons knowledgeable about and extensively involved in cloned cellular telephone activity. A reasonable factfinder could thus conclude that appellants' access to cloning equipment or services was regular and not merely occasional or sporadic.

Appellants simultaneously possessed over fifteen distinct means of account access corresponding to more than fifteen distinct subscribers' accounts. Fourteen of those account combinations were stored on microchips to allow immediate transmission. While the others were stored in a form that required an added step before they could be emitted to place cellular telephone calls, the surrounding evidence demonstrated that an ongoing cloned cellular telephone operation

---

[14]The extensiveness of appellants' operation was established by the testimony of a customer who had used appellants' service several times per week over several months and had regularly seen "many people waiting" to place calls. Ledgers documenting hundreds of calls corroborated this evidence of heavy and continuous use of appellants' telephones.

like appellants' would have had access to the means to complete that added step.[15] Indeed, as the district court emphasized in denying the motions for judgment of acquittal, several of the unprogrammed combinations had actually been used to place unauthorized calls.

In light of the evidence that the precise ESN-MINs at issue were actually used to obtain cellular telephone services, that appellants had extensively used and were extensively using other such unauthorized ESN-MINs to place cellular telephone calls, and that cloning equipment and processes were not particularly complex or inaccessible under the circumstances, a reasonable factfinder could conclude that the additional ESN-MINs were capable of being used to obtain cellular telephone services even absent proof of cloning implements in appellants' immediate possession.[16] Because the evidence was sufficient to prove that the unprogrammed ESN-MINs constituted additional access devices, and thus that appellants possessed and conspired to possess fifteen or more access devices, we affirm the denial of the motions for judgment of acquittal and the verdicts of guilt. *See Lyons,* 53 F.3d at 1200.

III.

At sentencing the district court found that appellants' call sell operation had caused

[15]In *United States v. Nguyen,* 81 F.3d 912 (9th Cir.1996), the appellant, who possessed account numbers and blank credit cards but no encoder with which to program the account numbers onto the cards' magnetic strips, argued that the cards did not constitute access devices "in the absence of evidence that the card and number could actually cause a debit to an account or would be so used." *Id.* at 914. Citing circumstantial evidence that the appellant would have had access to the means to combine the account numbers with the cards, the court held that the unprogrammed cards were access devices despite the lack of an encoder in the appellant's possession. *See id.* at 915. While *Nguyen* analyzed § 1029(e)(1)'s definition of "access device" in the context of a sentencing issue governed by a preponderance of the evidence standard, it nonetheless recognized that a means of access can constitute an access device even if use of that means of access requires an added step involving equipment that is not immediately available. *See also United States v. Caputo,* 808 F.2d 963, 966 (2d Cir.1987) (holding, without analysis of steps required to put account information to use, that credit card numbers printed on restaurant checks were access devices because § 1029 imposes no "requirement that the [account] number be printed on any particular medium").

[16]It is undisputed that ESN-MINs can potentially be used in conjunction with microchips to obtain cellular telephone services. Because the evidence established that this potential was realistic and foreseeable, we need not decide whether the definition of access device excludes means of account access whose capability of use is remote or speculative. Nor need we decide whether the analysis would differ under the amended definitional section that does not govern this case. *See supra* note 5.

$42,124.32 in losses to cellular telephone companies. Accordingly the court applied United States Sentencing Guidelines § 2F1.1(b)(1)(F) which increases the offense level by five when criminal conduct results in losses exceeding $40,000. While conceding that some loss, "maybe even a substantial loss, was attributable to [their] call sell operation,"[17] appellants contend that the government failed to carry its burden of proving the amount of loss. "When a defendant challenges one of the factual bases of his sentence ... the Government has the burden of establishing the disputed fact by a preponderance of the evidence." *United States v. Lawrence,* 47 F.3d 1559, 1566 (11th Cir.1995). This burden must be satisfied with "reliable and specific evidence." *Id.*[18] We review the district court's loss determination for clear error. *See United States v. Goldberg,* 60 F.3d 1536, 1539 (11th Cir.1995).

The government initially ascribed to appellants $80,924.63 in unauthorized calls that had been made using the ESN-MIN combinations found in appellants' possession. The evidence established, however, that multiple unauthorized users often use the same unauthorized ESN-MIN and that calls cannot be conclusively traced to a particular origin. To establish which of the $80,924.63 in calls were more likely than not attributable to appellants, the government presented a "cell site" analysis to identify the geographic area from which the calls emanated. As the government's expert explained, cell towers, each servicing an area referred to as a "cell site," are located across a geographic region to forward cellular telephone signals to the "cellular switch" that processes calls.[19] Cell sites are further divided into sectors. While cellular telephone company records do not reveal the precise location from which a call was placed, they do reveal the cell site and sector from which the call originated.[20]

Appellants' call sell service was located in cell site 18, which covered an area of one to one

---

[17]Appellants' Brief at 22.

[18]*See also United States v. Bernardine,* 73 F.3d 1078, 1080-81 (11th Cir.1996) (holding that government must prove facts warranting more serious sentence with evidence bearing "sufficient indicia of reliability to support its probable accuracy").

[19]*See* Transcript of Sentencing Proceedings at 36-37.

[20]*See id.* at 37, 39.

and three quarter square miles.  The government's expert described the area as "very congested."[21]
Test calls placed from appellants' store originated from sector A of that cell site.[22]  However, in
attributing $42,124.32 in unauthorized calls to appellants, the government's expert included calls
originating from both sector A and sector B because appellants' store was "right on the corner" of
those two sectors.[23]  When asked the proportion of the $42,124.32 in calls that originated in sector
A versus sector B, the expert responded that she did not know.[24]

The testimony also revealed that during peak calling times when an area's capacity is
exceeded calls may be diverted or "bounced" to adjacent sectors and sites, making those calls
indistinguishable from calls that actually originated in the adjacent sectors or sites.  Thus some calls
originating in cell site 18 sectors A and B but diverted elsewhere would be excluded from the record
of calls placed from those sectors, while some calls that actually originated elsewhere would be
improperly identified as originating in those sectors if heavy calling in the surrounding sectors or
sites had diverted those calls into cell site 18 sectors A and B.[25]

For sentencing purposes the loss attributable to a defendant "need not be determined with
precision.  The court need only make a reasonable estimate of the loss, given the available
information." U.S.S.G. § 2F1.1(b), comment (n. 8).  While estimates are permissible, courts "must
not speculate concerning the existence of a fact which would permit a more severe sentence under
the guidelines."  *United States v. Wilson,* 993 F.2d 214, 218 (11th Cir.1993).  We must decide
whether the district court erred by finding that the government proved by a preponderance of the
evidence that the loss attributable to appellants could be reasonably estimated without impermissible
speculation at $42,124.32.

The cell site analysis offered by the government and relied on by the district court contained

---

[21]*See id.* at 39.

[22]*See id.* at 44, 47.  Cell site 18 had three sectors.

[23]*See id.* at 47.

[24]*See id.*

[25]The surrounding sites covered an area of ten to twenty square miles.

inherent uncertainties. Although all test calls placed from outside appellants' store originated from sector A, the government also included all calls from sector B on the grounds that appellants' store was "on the corner" between the two sectors. While the fact that appellants' store was at the intersection between the two sectors suggests that appellants' calls could have gone to *either* sector, it does not, without more, support the inference that appellants were responsible for *all* calls from *both* sectors when none of the test calls originated from sector B. Moreover, while some calls may have "bounced" between sectors A and B, there was no evidence that more calls bounced out of sector A than into it and thus no evidence as to what portion, if any, of the sector B calls was more likely than not attributable to appellants.[26]

The evidence revealed that because bouncing occurs across cell sites as well as sectors, some of the calls shown as originating in cell site 18 sectors A and B may have actually originated in other cell sites. When questioned about the relative levels of calling traffic in cell site 18 versus an adjacent cell site the government's expert could not identify which cell site was busier and thus more likely to divert more calls to the other.[27] Therefore the evidence was inconclusive as to whether the number of calls bounced into cell site 18 from elsewhere, and thus improperly attributed to appellants, exceeded the number calls bounced out of cell site 18 and thus improperly excluded from the analysis.[28]

To justify a five-level increase under U.S.S.G. § 2F1.1(b)(1)(F), the government was required to prove by a preponderance of the evidence that a "reasonable estimate" of the losses exceeded $40,000. The government's estimate of $42,124.32, which the district court did not

---

[26]The government's expert testified that bouncing occurred primarily during rush hours totalling approximately four hours per day. The evidence provided no basis from which to estimate the proportion of the calls that occurred within those times and no basis from which to determine which sector was busier and thus more likely to divert calls to the other.

[27]*See id.* at 49.

[28]The analysis assumes that appellants were the only unauthorized users of the ESN-MINs in their concededly "very congested" calling area, although the government's expert stated that another fraudulent scheme had generated unauthorized calls from many locations including cell site 18 and that the government did not know whether the ESN-MINs in question were obtained from or shared with anyone else in the neighborhood. *See id.* at 57.

discount despite conceded uncertainties in the analysis, was only $2,124.31 above the minimum amount required by § 2F1.1(b)(1)(F). The government offered no evidence to support an inference that the margin of error in its calculation was less than $2,124.31 or that the analysis was more likely to underestimate than to overestimate the calls attributable to appellants. Thus the government did not establish by a preponderance of the evidence that the amount of loss could be reasonably estimated at over $40,000.[29] Because the government's figure of $42,124.32 was not a "reasonable estimate of the loss," reliance thereupon constitutes clear error. *See Wilson,* 993 F.2d at 218.[30]

## IV.

For the foregoing reasons we affirm the judgments of conviction, reverse the loss determination and remand for resentencing.

---

[29]The government suggests that the $42,124.32 figure resolved uncertainties in favor of appellants because it excluded nearly $40,000 in additional calls that used the ESN-MINs in question. However, there was no evidence linking appellants to the additional calls, whose origins were geographically remote from appellants' call sell service. The exclusion of those calls thus does not resolve uncertainties as to whether appellants generated all the relevant unauthorized calls from the "congested" area surrounding their call sell service. Since the amount of loss can be estimated from "general factors" such as the "nature and duration" of the conduct, *see* § 2F1.1(b)(1), comment (n.8), the government need not attribute specific calls to appellants. The government must, however, offer reliable, specific evidence estimating the volume of unauthorized calls appellants generated and the dollar amount reasonably attributable thereto. The evidence failed to establish by a preponderance that a reasonable estimate of these losses exceeds $40,000. We express no opinion as to whether on remand the government should be permitted to offer additional evidence. We leave that matter to the discretion of the trial court.

[30]Appellants were also ordered to pay $42,124.32 in restitution. Our conclusion applies to both the offense level computation and the order of restitution.