[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-10688

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 2, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-20157-CR-CMA

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

YAIR MALOL, a.k.a. Yanni,
a.k.a. Charlie Levy,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(February 2, 2007)**

Before PRYOR and FAY, Circuit Judges, and STEELE,* District Judge.

FAY, Circuit Judge:

---

* Honorable William H. Steele, United States District Judge for the Southern District of Alabama, sitting by designation.

Yair Malol ("Malol") appeals his conviction and sentence for wire fraud, extortion and conspiracy involving moving companies he owned. First, he appeals the admission of a summary chart at trial, arguing the chart is based on inadmissible evidence and was substantially more prejudicial than probative. Also, Malol appeals the district court's determination that the fraud scheme resulted in a loss amount of more than $1 million, thereby increasing his sentence guideline 16 levels. Finally, he appeals the district court's increase of his base offense level by two due to a Notice of Claim from the Department of Transportation ("DOT"). The district court held the Notice of Claim represented "a violation of [a] prior, specific judicial or administrative order, injunction, decree, or process" as per section 2B1.1(b)(7)(B) of the 2002 Sentencing Guidelines. For the reasons set out below, we affirm as to the admission of the summary chart at trial and as to the amount of loss. However, we vacate the sentence and remand for resentencing, finding that the enhancement based upon the DOT notice was error.

## BACKGROUND

Malol, the owner of several moving companies, was charged with 36 counts, including one count of conspiracy under 18 U.S.C. § 371, 16 counts of wire fraud under 18 U.S.C § 1343, 10 counts of extortion under 18 U.S.C. §§

2

1951-52, eight counts of making a false bill of lading under 49 U.S.C. § 80116, and one count of conspiracy to commit money laundering under 18 U.S.C. § 1956(h). He was convicted of all but three counts.[1]

## A. The Investigation and Malol's Arrest

Special Agent Kimberly De Leo of the FBI testified at length about conversations with Malol. During questioning prior to his arrest in March of 2003, Malol admitted that he owned Majesty Moving Company ("Majesty"), which he opened in 1997. He said Majesty was a company that contracted with customers, via email or telephone, for interstate delivery of furniture and other residential items. When contracting with a new customer, Malol said the customer would provide a list of the items to be moved, and Majesty would calculate the initial price. Malol also stated that when the movers would arrive, there would often be discrepancies between what a customer estimated and the actual cubic footage necessary. This could cause an increase in the final charge.

Malol admitted that he opened Apollo Van Lines ("Apollo") in his wife's name because there had been numerous complaints to the Better Business Bureau involving Majesty. However, Malol operated Apollo himself and his wife was not

---

1. Malol was acquitted of one count of wire fraud, one count of extortion, and one count of making a false bill of lading.

3

involved. He admitted opening Apollo so potential customers would not see his name involved or connect Apollo to Majesty.

Malol also admitted that, at the time of his arrest, he had two customers' goods in storage, due to their nonpayment. He said one customer's goods had been there for seven months, the other for a year. He told Agent De Leo, however, that he was not holding the goods "hostage."

## B. The Undercover Operation

Special Agents William Schureck, Marie Lavelle, and retired agents Irvin Bruce and Eugene Flynn testified about an undercover operation that took place in December 2001-January 2002, when Lavelle posed as a customer moving to Atlanta, Georgia from Fort Lauderdale, Florida. The two retired agents posed as Lavelle's uncle and father. The agents told Majesty[2] that Lavelle's first mover had fallen through and she urgently needed a replacement. Lavelle testified that she portrayed someone that feared the loss of a "lifetime of household goods," including photo albums and heirlooms.

On August 23, 2001, Majesty picked up the goods and the agent posing as

_____

2. To minimize confusion, when the record is unclear which company name was used with a particular customer or when the company name used is inconsequential, we will refer to the company as "Majesty," while the names used may have been any of Malol's company names, such as Apollo Van Lines, Net King Van Lines, America's Best Movers, Atlantic Van Lines, US Moving Network, USA Van Lines, First Class Van Lines, and Zebra Movers.

Lavelle's uncle signed a receipt and a bill of lading. He also provided the movers with a cashier's check for $925, which was half of the original $1,850 quote.[3] After the moving truck was packed, loaded, and preparing to depart, the price became $4,000. Lavelle had several phone conversations with Majesty employees and with Malol about retrieving her goods, including one where she threatened to call the FBI. After this threat, Malol offered to charge the $1,850, but plus the cost of packing materials, a charge that was included in the original quote.

On September 7, one of the undercover agents, posing as Lavelle's father, drove a leased luxury car to meet Malol at his office. Once there, Malol offered to move the furniture and household goods to Atlanta for $4,576. This was ultimately reduced to $3,500, or, alternatively, Malol offered to let Lavelle pick up the goods for about $1,690. Finally, on September 10, Majesty made a final offer of $1,000 to allow Lavelle to pick up the goods in Plantation. Majesty never moved the goods to Atlanta.

## C. Victims' testimony

The jury heard a number of Majesty's customers testify about their experiences in dealing with Malol's various moving companies. Samples are put forth below.

_____

3. There is also testimony that the original quote started as low as $1,000.

1. The Simpson Family

Rick Simpson testified that he and his family moved from Indiana to Alabama in August of 2002. After receiving an estimate of $4,800 for the move from another moving company, Simpson contacted one of Malol's companies, U.S. Moving Network. Simpson faxed them the information summarized by the other moving company and information regarding new furniture he had purchased. U.S. Moving Network gave him an estimate of $3,100. Simpson then mailed a deposit check of $2,262.

The movers picked up Simpson's furniture on August 28. After surveying his home, the movers claimed Simpson had provided an incorrect estimate of the amount of household goods to be moved. The movers informed him that an additional $1,000 was needed. Because the $4,100 total was still below the original estimate from the other company, and because Simpson's employer was paying for the move, he did not object. Simpson also purchased additional insurance to cover his belongings for the move, raising his coverage from 60 cents to $6.00 per pound.

The original scheduled delivery date was September 1. However, on September 1, they did not arrive. Simpson contacted the company and was told the movers would arrive on September 4. When this date arrived, the movers still

did not appear. When Simpson called again, he was told the furniture would be delivered on September 8. Simpson explained that his family would be arriving on September 8, and delivery of the furniture on that day was crucial. Once again, the furniture did not arrive. This time Simpson was given a date of September 13. When the furniture did not arrive on this date, Simpson asked to speak with the owner of the company (Malol). Simpson asked Malol where his goods were stored so he could make other arrangements to have them picked up. Malol told Simpson he had to pay the balance before he would tell him where his furniture was being kept. Malol also told Simpson he would get his goods delivered, but he wanted to fax him some documents to sign first. However, he never faxed Simpson any documents.

After several more proposed delivery dates passed, Majesty delivered the furniture at 5:00 p.m. on October 1. When Majesty arrived they refused to unload the goods until Simpson paid the balance. After Simpson paid the movers, he and his family noticed that their new bedroom set, including their mattresses, was tied to the outside of the truck. Their lawnmower was tied above other bedroom furniture, and had leaked gas and oil onto it. When the movers opened the truck, it became clear that much of the newly purchased furniture, which the Simpsons had packed with extra padding before the movers picked it up, was out of its

7

packaging and damaged. It also appeared that their boxes had been rifled through, and then retaped. When they opened their boxes, the Simpsons learned that many of their belongings had been stolen, including two leather jackets and an estimated $3,000 in Craftsman tools. They found other boxed items broken, such as wine glasses and vases.

The movers blamed the damage on a different mover, and told the Simpsons that if they had insurance, the damage would be covered. Simpson's wife attempted to deal with the company regarding the insurance coverage. Despite repeated requests and 50-60 telephone calls to the company, the company did nothing.

Some time later, the movers acknowledged having two boxes in their possession which contained the son's trophies and other personal items of great sentimental value. The movers advised, and Jennifer Vaknin, Malol's secretary, confirmed, that the boxes would be delivered. The Simpsons never received these items.

Majesty did not reimburse the Simpsons for their damaged and stolen goods- a loss of approximately $25,000.

2. Karl Johnson

In 2002, Karl Johnson made arrangements with Majesty to move his

furniture and other household goods from Carson City, Nevada to Clearwater, Florida. Majesty quoted Johnson an initial price of $1,395. Majesty was to pick up the goods on August 1, which was the day Johnson's apartment lease terminated. The movers did not appear on that date. Unable to make alternative arrangements with another moving company, Johnson agreed with Majesty's new August 6 pickup date.

Majesty's movers arrived on August 6th, but after loading Johnson's belongings, raised the cost to $5,200. Johnson was told that if he did not pay the increased amount the truck would be unloaded. Faced with having his belongings placed in the street or in an apartment he was no longer occupying, Johnson paid the movers.

The movers said they would deliver Johnson's goods in Clearwater on August 18, but did not arrive. Several phone calls later, Majesty scheduled Johnson for a September 3 delivery date. On September 3, the movers arrived. After the truck was unloaded, Johnson noticed that his patio furniture and his 300-pound safe were missing. The safe contained an autographed picture of Babe Ruth given to Johnson by his mother, as well as a firearm. Upon inspection, Johnson noticed more items missing. Johnson contacted Majesty to discuss an insurance claim, and was promised the necessary forms. Majesty never sent any forms, nor

did Johnson recover any of his missing items.

3.  Brian Durkin

Brian Durkin hired First Class Van Lines to move him from Santa Monica, California to Centerville, Massachusetts.  After getting several quotes from other companies, Durkin received a quote of $6,937 from First Class Van Lines.  This price included all moving services and insurance.  After failing to show up on the agreed upon date, the movers did arrive the next day.  The bill of lading Durkin signed was titled with the name 'Majesty.'

After the movers loaded his goods and drove away, Durkin received a fax that changed the price of the move to $25,401.  The total included a charge of more than $3,000 for boxes and materials, even though Durkin had supplied his own boxes and tape.  Over the next month, Durkin called Majesty several times in an attempt to recover his goods.  Each time he called Durkin was advised that his goods would be sold at auction if he did not pay the bill.  Throughout this time, the cost fluctuated from $25,401 to just over $8,000.  After Durkin enlisted "outside assistance," the movers delivered Durkin's goods for the original price.[4] However, Durkin noticed many of his goods were damaged.  He chose to pursue

4.  The jury, while hearing that Durkin paid the original price after outside assistance, did not hear the fact that it was FBI intervention that finally got his goods delivered.

10

an insurance claim with his own company rather than Majesty because he knew "who [he] was dealing with."

4. Sharon Donaldson

Sharon Donaldson contacted Apollo Van Lines about her move from Lake Worth, Florida to Middletown, Connecticut in September of 2000. Apollo gave her an initial estimate of approximately $1,100, after they had gone to her home and inspected her household goods. When Apollo appeared and began loading Donaldson's goods, she was informed that the price would be higher than the original estimate. She was not told how much higher, and she was not concerned since Apollo had told her in previous conversations that the price might vary by $100-$150. Apollo's movers had her sign a blank bill of lading. When they were nearly finished loading the truck, the movers then told Donaldson that the cost would be $2,900. After several phone conversations, the price was lowered to a final figure of $2,500.

On October 31, three weeks after the first scheduled delivery date, the movers arrived. Before they would unload any furniture, they demanded to be paid. When Donaldson refused to pay until they started working, the movers got in their truck and drove away. When she called the company, they demanded another $60 "redelivery fee." When the truck returned, Donaldson paid the

11

movers and they began unloading the goods.

After the goods were unloaded, Donaldson noticed extensive damage to her new mattress and bedroom set, her new office furniture, and china given to her by her grandmother. The total amount of damages exceeded $13,000. When Donaldson called Apollo to file a claim for her losses, Apollo denied having any record that she had been a customer. Apollo also denied that she had been a customer when the Better Business Bureau contacted them on Donaldson's behalf. Eventually, Donaldson contacted Apollo's insurance company directly and was reimbursed for some of her loss.

5. Beverly Feldmann

Beverly Feldmann and her husband contacted America's Best Movers to move their furniture from Defiance, Ohio to Prescott, Arizona. The company gave them an initial estimate of $2,785, including a $300 deposit. This estimate included boxes, packing materials, and a month of storage. After the movers loaded the Feldmann's goods and drove away, they raised the cost to $9,200. After failing twice to show up as scheduled, the movers appeared and immediately demanded payment. The Feldmanns paid the inflated bill.

As the movers unloaded the furniture, Beverly Feldmann noticed the love seats had ice on them, which began melting on her great room floor. The boxes of

goods were wet and contents, such as china and glassware, were falling out of the boxes as the movers unloaded them. Because they had to walk up a hill to deliver the goods, the movers grew frustrated and began throwing the furniture out of the truck, breaking legs on chairs and tables. When Beverly Feldmann threatened to call the police, they taunted her and invited her to do so, claiming the police could do nothing because it was a civil matter. The next morning, Beverly found pieces of her jewelry in the street, smashed by cars and ruined. When she and her husband contacted America's Best Movers to file a claim, they denied any responsibility and advised the Feldmanns to file a claim with their homeowner's insurance company.

6. Nicole and George Philbeck

In August of 2000, the Philbecks contacted Majesty to move from Delray Beach, Florida to Fairfax, Virginia. The original estimate was $2,500. This was based upon an inspection of their apartment. On the day of the pickup, Malol himself came with the movers. Malol had Nicole Philbeck sign a blank bill of lading. When the truck was halfway loaded Malol told Mrs. Philbeck that it was going to cost "a couple hundred dollars more" due to a mistake in calculating the cubic footage required. After consulting her husband by phone, Mrs. Philbeck decided to let Majesty proceed. When Majesty finished loading the truck, Malol

13

then told Mrs. Philbeck she owed $5,700, more than double the original estimate. In addition, Malol intimidated Mrs. Philbeck into giving him a "tip." She ultimately gave Malol $40, $10 per mover. She also paid one half of the inflated price.

The Philbecks decided to let Majesty complete the move, planning on paying the remainder with a credit card in the hope they could contest the charge once they had their furniture returned. The movers arrived in Fairfax a day late and immediately demanded payment. The Philbecks paid the bill using their credit card and the goods were unloaded. Many items had been damaged. The Philbecks did not succeed in disputing the credit card charge.

7. Additional Victim Accounts

Other customers testified to similar stories involving drastic price increases once Malol's movers took possession the goods. In most instances, the movers demanded full payment before they would begin unloading the trucks. Once the movers delivered the goods, items were missing and/or severely damaged. Customers found it extremely difficult, if not impossible, to collect on insurance claims through any of Malol's companies.

**D. Employee Testimony**

Yosef Zaguri testified that he began working for Majesty in September of

2001 as a dispatcher and a customer service agent. Zaguri pled guilty to conspiracy and two extortion counts and received a 41 month prison sentence for his part in this scheme.

Zaguri testified that Majesty received "three to four [new] jobs a day." Zaguri testified that Majesty foremen received a 10-15% commission and sales personnel received a 3-6% commission. Zaguri was paid strictly on a salary basis. Zaguri testified that to increase the amount of cubic footage billed to the customer, movers would commonly surround an empty space with furniture or goods in the middle of the truck, and charge the customer for that additional space. Malol told Zaguri that the goal was to make as much money as possible. After numerous customer complaints, Zaguri told Malol that he needed to change the price of the additional cubic footage because the increases often more than doubled the total price.

Zaguri testified that if the customers refused pay the inflated charge, Majesty would put the goods in storage. When the customer would call, Zaguri would try to convince them to pay the inflated charge. Zaguri testified that this procedure was used in 98% of the moves, despite being aware that the DOT's regulations prohibited movers from charging more than 110% of a non-binding

estimate.[5] Although Majesty possessed bills of lading with the 110% rule printed on them, these were never used.

Zaguri testified that Majesty used several other names, such as The Movers, U.S. Moving Network, and Apollo Van Lines. Malol used these other names because Majesty had developed a bad reputation. Zaguri testified that Malol was well aware of the practice of inflating prices and holding the customers' goods hostage. He testified that three out of four customers called to complain about their moves. He further testified that if a customer called to complain about an inflated price, he had the authority to reduce the price by $500, but he needed Malol's permission to make any further reductions.

Zaguri also testified about how Malol established two other companies, Zebra and Atlantic. Malol formed these companies under the name of employee Nissim Edri, over Edri's objection. Malol's secretary signed Edri's name on the corporate records for Atlantic and Zebra in Malol's presence. Zaguri also testified that the customers' goods were damaged in 95% of moves.

Regarding insurance claims, Zaguri related that they would pay small

---

5. "[A mover] must clearly indicate on the face of a non-binding estimate, the estimate is not binding upon you and the charges shown are the approximate charges to be assessed for the services identified in the estimate. The estimate must clearly state that the shipper may not be required to pay more than 110 percent of the non-binding estimate at the time of delivery." 49 C.F.R. § 375.405(b)(5)

insurance claims, but would not pay claims on amounts totaling $500 or more. Furthermore, both Malol and Zaguri would instruct drivers and foremen on how to inflate prices, by adding cubic footage, packing, and materials.

Finally, Zaguri admitted that he and other Majesty employees used false names to avoid detection by authorities. If authorities came looking for them, they could claim the person they were looking for no longer worked there. Zaguri, for example, used the alias "Joe Vekin."

Harold Jaspar, one of Majesty's former drivers also testified. He testified that he received frequent complaints from overcharged customers and that the movers often damaged goods by packing them into tight storage facilities. Moreover, Jaspar acknowledged that customers, at times, would underestimate the cubic footage needed for their belongings, but this was infrequent.

In one particular instance, Jaspar testified that a customer refused to pay and Malol instructed him not to unload the truck, even though an FBI agent at the scene threatened to arrest him. Only after arguing with Malol all day on the phone did Jaspar receive permission to unload.

Majesty foreman Hod Schlit testified that Malol instructed him to have the customers sign blank bills of lading. He testified that when he began working for Malol, he would load a customer's furniture and then telephone Malol to find out

how much to inflate the price of the move.  At such times, Malol, rather than actually calculating the cubic footage, would ask Schlit what kind of cars were in the driveway, the quality of the furniture in the home, and the occupation of the customer.  Malol would then instruct Schlit on an inflated price.  Schlit also testified that he completed an estimated 20 moves per month

**E. The Summary Chart**

At trial, the government had FBI Agent Marlene Benson identify a summary chart.  The FBI seized customer files relating to 979 moves.  Benson testified that the FBI compiled the chart from data gathered from Majesty's files on 721 of those customers.  The chart did not include data from the files of another 258 customers, because those files were incomplete.  Only 17 of the 721 customers actually paid the figure quoted to them initially.  The remaining 704 customers paid additional charges amounting in the aggregate to over $1.3 million.

**F. The Amount of Loss**

At Malol's sentencing, the district court used a 16-level increase based upon a loss figure of more than $1 million, pursuant to  USSG § 2B1.1(b)(1)(I) (2002).  In its deliberations, the jury had been asked to determine a loss figure.  They found, beyond a reasonable doubt, that the loss totaled more than $1 million and less than $2.5 million.

**G. The Notice of Claim**

After the DOT's Federal Motor Carrier Safety Administration ("FMCSA"), which regulates the moving industry, conducted an onsite inspection at Majesty's office, it sent Majesty a Notice of Claim for violating DOT regulations. Asserting his right to an administrative hearing, Malol replied to the Notice and requested a hearing. Because the FMCSA knew that criminal charges had been filed against Malol, the DOT held their civil proceedings in abeyance. No hearing was ever held on the Notice of Claim.

At sentencing, the district court used the letter to increase Malol's base offense level by two pursuant to USSG § 2B1.1(b)(7)(C) (2002), which states such an increase is proper for "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines."

## STANDARD OF REVIEW

There are three issues on appeal before this Court:

I. Whether the district court erred in admitting the summary chart at trial.

II. Whether the district court erred during sentencing when it accepted the calculated loss figure of more than $1 million.

III. Whether the district court erred in imposing a two-level increase based on its

finding that the Notice of Claim was sufficient under USSG § 2B1.1(b)(7)(C) (2002).

In examining a court's evidentiary rulings at trial, including the admission of a summary chart pursuant to Federal Rule of Evidence 1006, we review for an abuse of discretion. *United States v. Massey*, 89 F.3d 1433, 1441 (11th Cir. 1996) (*citing United States v. Norton*, 867 F.2d 1354, 1362 (11th Cir.), *cert. denied*, 491 U.S. 907, 109 S.Ct 3192, 105 L.Ed.2d 701 (1989)).

We review the sufficiency of the evidence *de novo*, to determine whether a reasonable jury could have concluded that the evidence established the loss amount beyond a reasonable doubt. *United States v. Diaz*, 248 F.3d 1065, 1084 (11th Cir. 2001). "The evidence is viewed in the light most favorable to the government and all reasonable inferences and credibility choices are made in the government's favor." *Id. See also United States v. Lyons*, 53 F.3d 1198, 1200 (11th Cir. 1995); *United States v. Johnson*, 713 F.2d 654, 661(11th Cir. 1983).

"The district court's interpretation of the Sentencing Guidelines is a question of law which this Court reviews *de novo*." *United States v. Miranda*, 348 F.3d 1322, 1330 (11th Cir. 2003) (*citing United States v. Gonzalez*, 2 F.3d 369, 371 (11th Cir. 1993)).

## ANALYSIS

## A. The Summary Chart

Under the circumstances of this case, it seems appropriate for us to first consider whether or not Malol suffered any prejudice by virtue of the summary chart being received in evidence.

"Even if an abuse of discretion is shown, nonconstitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." *United States v. Sellers*, 906 F.2d 597, 601 (11th Cir. 1990); Fed.R.Evid. 103(a); *see also United States v. Stout*, 667 F.2d 1347, 1352 (11th Cir. 1982); *United States v. Nill*, 518 F.2d 793, 802 (5th Cir. 1975); *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct 1239, 90 L.Ed. 1557 (1947);. Therefore, even if the district court erred when it admitted the chart, we will not reverse unless it affected Malol's substantial rights.

Where there is overwhelming evidence of guilt, and the error "did not influence the jury, or had but a very slight effect, the verdict and the judgment should stand." *United States v. Constant*, 501 F.2d 1284, 1289 (5th Cir. 1974) (*citing Kotteakos v. United States*, 328 U.S. at 764-765, 66 S.Ct. at 1248, 90 L.Ed. at 1565).

In this case, 32 individual victims testified to the illegal actions of Malol and his companies. Each victim outlined a like manner of extortion, being

provided blank and/or false bills of lading, and being quoted fraudulently low prices over the phone or internet to solicit their business. These accounts amount to overwhelming evidence of guilt. The *modus operandi* was beyond question. It was the firmly established way of doing business.

Furthermore, evidence was presented by the FBI agents who arrested Malol that he admitted opening new moving companies because his original companies developed bad reputations after customers complained to the Better Business Bureau. Malol admitted that he listed one new company, Apollo, in his wife's name to conceal his association with the company from potential customers. In addition, several of Malol's employees testified that these illegal activities had been going on for many years, and that Malol was not only fully aware of them, but he orchestrated them.

Yosef Zaguri testified that the practices of fraudulently inflating prices and stealing customers' goods were in place when he started working for Malol in September of 2001. He testified that these types of abuses typified 98% of the moves. Foreman Hod Schlit testified that Malol instructed him to have customers sign blank bills of lading, presumably so that Majesty could fill in the forms later with fraudulent price figures. Also, Schlit testified that before he gave a customer the inflated price, he would call Malol and tell him what kind of car(s) the

22

customer drove, what kind of furniture they had, and what kind of work they did. After considering all this, Malol would give Schlit the inflated final price, based on what he thought they could successfully extort.

When taken cumulatively, the evidence presented against Malol is overwhelming. The summary chart merely repeated the same type of evidence as already presented. Thus, even if the district court erred by admitting the chart, the error was harmless and does not warrant reversal.[6]

## B. Amount of Loss

Malol disputes the jury's finding that the amount of loss was more than $1 million. When the district court adopted this loss amount at sentencing, it resulted in a 16-level increase of Malol's base offense level under USSG § 2B1.1(b)(1)(I) (2002). Usually, the government must prove disputed facts at sentencing by a preponderance of the evidence. *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997). However, the trial of this case was held between the opinions of the Supreme Court issued in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)(striking the sentencing guidelines used in the state of

---

6. Malol argues that the evidence summarized in the chart was inadmissible hearsay, and the district court erred when it admitted the chart. However, we hold that even if the admission of the chart was error, it was harmless error based on the overwhelming evidence of guilt. Thus, we need not address whether, in fact, error exists.

Washington) and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160

L.Ed.2d 621 (2005)(making the federal sentencing guidelines advisory). The

indictment charging Malol included an allegation that the loss exceeded $1

million. Consequently, the district court charged the jury as to this allegation

using the standard burden of proof beyond all reasonable doubt. Thereafter, the

district court agreed that the evidence was sufficient (overwhelming) and used the

loss figure in making the computations under the sentencing guidelines. We agree

that the evidence fully supports this loss figure.[7]

Malol argues that the amount of loss figure used to increase his sentence

included charges quoted to customers such as Brian Durkin, who paid the original

---

7. There is ample evidence in the record outside of the summary chart on which the jury's finding, and the sentencing judge's acceptance of that figure, could be based. There is testimony from former employees that this type of inflation occurred in 98-99% of Majesty's moves. There is testimony from Agent Benson that 979 customer files were seized, and that these files showed at least 721 complete moves. There is also testimony from Hod Schlit stating that he participated in about 20 moves per month. Also, on the same issue, Yosef Zaguri testified that Majesty received three to four new jobs a day. Finally, based on the six accounts presented above, there was an average intended inflation of nearly $6,000 per move. These figures provided the trial jury with more than sufficient evidence to conclude the total loss amount was greater than $1 million. At sentencing, the district judge considered the jury's loss figure as well as the Presentence Investigation Report, which found that Majesty made an estimated 1224 moves and accumulated more than $1.8 million through fraud. Malol responded by presenting evidence that in some situations, such as in Brian Durkin's move, the customer paid the original estimate, and thus, the loss amount was too speculative. However, since intended loss is calculated when it is greater than actual loss with regard to sentencing under USSG § 2B1.1(b)(1) (2002), the fact that law enforcement officials may have helped other customers pay their original estimates as they did with Mr. Durkin is irrelevant. There was no objection by the defendant to the number of moves or the total intended loss.

24

quote, not the inflated price.  Thus he argues, such charges are analogous to questionable phone calls in *Sepulveda*, 115 F.3d at 890, and the district court should not have included them in the loss amount.

This argument fails for two reasons.  First, the applicable sentencing guideline states that "if the intended amount of loss due to the offense is greater than the actual loss, then the district court may use the intended loss in calculating the amount of loss."  USSG § 2B1.1 comment (n.2(A));  *United States v. Nosrati-Shamloo*, 255 F.3d 1290, 1291 (11th Cir. 2001).  There is evidence that the only reason Durkin and other customers escaped Majesty's inflated prices was that they enlisted the assistance of law enforcement.

More importantly, the jury determined this loss figure beyond a reasonable doubt in accord with the instructions received from the district judge.  No such jury finding exists in *Sepulveda*.  When a jury makes a finding of a fact beyond a reasonable doubt, that finding exceeds the government's preponderance of the evidence burden otherwise applicable at sentencing.  There was no error in using a loss figure of over $1 million as determined by the jury since such a figure is amply supported by the evidence presented.

## C. The DOT Notice of Claim

Malol also appeals the decision to increase his base offense level by two on

the basis of the DOT Notice of Claim. The district court accepted this as "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines" under USSG § 2B1.1(b)(7)(C) (2002). The comments to the Guidelines explain that the enhancement applies to a defendant who "commits a fraud in contravention of a prior, official judicial or administrative warning, in the form of an order, injunction, decree, or process, to take or not to take a specified action." USSG § 2B1.1(b)(7)(C) cmt. n.5 (2002).

The problem with this ruling is that after he received the DOT's Notice of Claim, Malol's attorney sent a written request for a hearing. The FMCSA never held such a hearing because it knew criminal charges were pending. FBI Agent Manzanares testified that the DOT never adjudicated its case against Malol. Malol had a legal right to contest the allegations in the Notice of Claim and he did so. There was no final adjudication or ruling of any sort.

In *United States v. Phillips*, 363 F.3d 1167 (11th Cir. 2004), this Court affirmed a two-level enhancement under section 2B1.1(b)(7)(C) for a father who failed to pay child support. This was a clear violation of a final court order. However, in *United States v. Wallace*, 355 F.3d 1095, 1098 (7th Cir. 2004), the Seventh Circuit held that the two-level enhancement was not justified when the

26

defendant violated a written "Statement of Voluntary Discontinuance" made to the U.S. Postal Inspection Service by continuing to purchase telecommunications equipment through U.S. mail with bad checks.

The *Wallace* court explained that the Statement of Voluntary Discontinuance was informal, and did not involve extensive negotiations. *Id.* at 1098. The *Wallace* court also quoted the Ninth Circuit decision in *United States v. Linville*, 10 F.3d 630, 632-33 (9th Cir. 1993), which warned against applying the two-level enhancement to every situation where "a defendant knew or was told by someone in authority that what she was doing was illegal." *Wallace*, 355 F.3d at 1098.

The instant case is akin to *Wallace*. The DOT's Notice of Claim was merely a warning that Malol's activities were illegal. As a matter of law, Malol had a right to contest this charge- which he did. The DOT never made a final adjudication on this notice. Thus, the Notice of Claim did not represent final agency action. Under the Administrative Procedures Act, Malol was entitled to, and his attorney requested, a hearing. 5 U.S.C. § 554 (2002). The government cannot use the Notice against Malol when the DOT failed to hold a hearing. This case is distinct from *Phillips*, where the court ordered the defendant to pay child support, and subsequently found that he did not comply. In the instant case, the

27

DOT held no hearings and made no findings after sending the Notice of Claim. Thus, we hold that the notice simply fails to meet the requirements of section 2B1.1(b)(7)(c) (2002) and error exists.

We do not hold, however, that every sentence increase based on section 2B1.1(b)(7)(C) requires a hearing to be valid. The key issue is whether the order or process has been finalized. A hearing is only required due to the particular facts of this case, namely that the Notice stated that Malol could contest it in a hearing, Malol requested such a hearing, and the DOT never held one. Because a hearing was required to make the Notice of Claim a final agency action, there cannot be a base level increased pursuant to 2B1.1(b)(7)(C).

## CONCLUSION

We hold that Malol suffered no prejudice as a result of the admission of the chart. We affirm the 16-level enhancement based upon the amount of loss. We vacate the sentence imposed and remand for resentencing instructing that there be no enhancement based upon the Notice of Claim issued by the DOT.

**CONVICTION AFFIRMED, SENTENCE VACATED AND CASE REMANDED FOR RESENTENCING**.