[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 12-15235, 12-15301
_____

D.C. Docket Nos. 1:10-cr-00202-RWS-RGV-1, 1:10-cr-00202-RWS-RGV-2


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OPEOLUWA ADIGUN,
a.k.a. Mary Afolabi,
CHUKWUKA ONYEKABA,
a.k.a. Gabriel Onyekaba,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____
(May 23, 2014)

Before PRYOR and MARTIN, Circuit Judges, and HONEYWELL,[*] District
Judge.

_____

[*] Honorable Charlene Edwards Honeywell, United States District Judge for the Middle District
of Florida, sitting by designation.

PER CURIAM:

After a jury trial, co-defendants Opeoluwa Adigun and Chukwuka Onyekaba were convicted of multiple counts primarily related to their alleged participation in a scheme in which they stole other individuals' identities and used them to open financial accounts from which they would withdraw funds. Adigun was convicted of seven counts of access device fraud in violation of 18 U.S.C. § 1029(a)(2), (3), (5) (Counts 2–7, 15), ten counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) (Counts 8–12, 16, 23–26), eight counts of bank fraud in violation of 18 U.S.C. § 1344 (Counts 13–14, 17–22), and one count each of conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(b)(2) (Count 1), immigration fraud in violation of 18 U.S.C. § 1546(a) (Count 27), Social Security fraud in violation of 42 U.S.C. § 408(a)(6) (Count 28), and passport fraud in violation of 18 U.S.C. § 1542 (Count 29). Onyekaba was convicted of thirteen counts of access device fraud in violation of 18 U.S.C. § 1029(a)(2), (3), (5) (Counts 2–7, 33–34, 36–37, 39, 41, 45), eleven counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) (Counts 8–12, 32, 35, 38, 40, 42, 46), and one count each of conspiracy to commit access device fraud in violation of 18 U.S.C. § 1029(b)(2) (Count 1), attempted access device

2

fraud in violation of 18 U.S.C. § 1029(a)(2), (b)(1) (Count 31), and mail theft in violation of 18 U.S.C. § 1708 (Count 30).[1]

At trial, the government introduced evidence to support its theory that the defendants, a romantic couple with children together, utilized Adigun's position as a letter carrier with the U.S. Postal Service to intercept mail sent by financial institutions and intended for individuals on her mail route. After using these individuals' identities to open financial accounts in said individuals' names, the defendants would typically transfer the funds to other accounts and then use those funds to purchase gasoline, electronics, gift cards, and other items.

The government also introduced evidence that Adigun had stolen the identity of another Nigerian woman, Mary Afolabi, and had used that identification information to enter the United States, apply for and obtain naturalization, obtain a job as a postal worker, and open financial accounts.

On appeal, Onyekaba contends that there was insufficient evidence to convict him of mail theft, the aggravated identity theft counts, or access device fraud as charged in Count 2 for possession of fifteen or more unauthorized access devices. He also argues that the district court erred in allowing the government to introduce evidence that he was once stopped at a Macy's department store for

---

[1] The jury returned guilty verdicts on all but two counts of the 46-count indictment. Those two counts (Counts 43 and 44) had previously been dismissed by the district court pursuant to Onyekaba's Rule 29 motion.

shoplifting three watches.  In addition, both defendants challenge the district court's denial of their motions to suppress evidence obtained during a warrantless search of a motor vehicle in which they were driving.  Finally, the defendants challenge their sentences, arguing that the district court erred in calculating the loss amounts.  Seeing no error, we affirm.

## I.  MOTIONS TO SUPPRESS

On March 5, 2010, law enforcement officers obtained a warrant for Adigun's arrest on charges that she had committed identity fraud in Douglas County.  The next day, Detective Louis Guy of the Paulding County Sheriff's Office, Agent Dominick DelMastro of the U.S. Postal Service's Office of Inspector General, Officer Keith Bowles and Detective Jason Walden of the Hiram Police Department, and Agents John David Walker and Kevin Arline of U.S. Immigration and Customs Enforcement participated in a traffic stop of the defendants.  The officers initiated the stop after Onyekaba, driving a Lincoln Navigator, picked up Adigun outside her post office duty station upon the completion of her mail route.  During the stop, the officers ordered Adigun out of the vehicle and arrested her pursuant to the arrest warrant.  The officers, who did not have a search warrant for the Navigator, proceeded to search the vehicle, and they found fifteen $100 American Express and Walmart gift cards, which they later determined were purchased using the stolen identities of individuals who lived on Adigun's mail

4

route.  The officers also discovered receipts of money orders sent to a "Margaret Adigun" in Nigeria from "Opi Adigun", in amounts ranging from $100 to $700.

The defendants moved to suppress the evidence obtained from the search, arguing that the search violated the Fourth Amendment's prohibition on unreasonable searches and seizures.  After an evidentiary hearing, a magistrate judge issued a report and recommendation recommending that the district court deny the motions to suppress because the search was permissible both under the automobile exception to the Fourth Amendment's warrant requirement and as a vehicle search incident to arrest under *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009).[2]  After the defendants filed objections to the report and recommendation, the district court entered an order adopting the magistrate judge's findings and denying the motions to suppress.

A district court's ruling on a motion to suppress presents a mixed question of law and fact.  *United States v. Heard*, 367 F.3d 1275, 1278 (11th Cir. 2004).  We review the district court's findings of fact for clear error and its application of law to the facts *de novo*, viewing all facts in the light most favorable to the party that prevailed in the district court—in this case, the government.  *Id*.

---

[2] The magistrate judge also determined that, at a minimum, the officers' seizure of Adigun's wallet, which contained the gift cards, was permissible under the plain view doctrine.  Moreover, because the magistrate judge concluded that the search was permissible under the automobile exception and as a vehicle search incident to arrest, he did not address the government's alternative theory that the search was permissible because Onyekaba consented to the search.

5

Under the Fourth Amendment, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Gant*, 556 U.S. at 338, 129 S. Ct. at 1716 (internal quotation marks omitted). In this case, the district court found two such exceptions applicable: the automobile exception and the exception for a vehicle search incident to arrest.

## A.    Automobile Exception

Under the automobile exception, law enforcement officers may conduct a warrantless search of a vehicle if: (1) the vehicle is readily mobile (i.e., operational); and (2) officers have probable cause to believe the vehicle contains contraband or evidence of a crime. *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006). The defendants assert that neither prong has been met here.

As to the first prong, the defendants do not actually dispute that the vehicle being driven by Onyekaba was readily mobile at the time of the traffic stop. Rather, they complain that law enforcement officers chose to forgo the pursuit of a search warrant for the vehicle, and that officers also chose to forgo several opportunities to apprehend Adigun throughout the day of the arrest, instead waiting until Onyekaba arrived to pick her up from the post office. The defendants point to Detective Guy's admission that one of the reasons the officers delayed in executing Adigun's arrest warrant was because they wanted to search the Navigator, for

6

which they did not have a search warrant.  The defendants maintain that the officers' "manipulative use" of Adigun's arrest warrant undermines the central justification for the automobile exception, which is that automobiles can become quickly "unavailable" for searches based on the turn of a key.  *See California v. Carney*, 471 U.S. 386, 392–93, 105 S. Ct. 2066, 2070 (1985) (stating that the two justifications for the automobile exception are the ready mobility of motor vehicles and the reduced expectation of privacy stemming from the use of a vehicle).  According to the defendants, Adigun was "available" for arrest throughout the day.

We find the defendants' criticism of the officers' motivations in deciding to delay the execution of the arrest warrant to be unavailing, as we have explained that "[a]n officer's 'subjective intentions' are not relevant for Fourth Amendment analysis."  *United States v. Hernandez*, 418 F.3d 1206, 1209 n.4 (11th Cir. 2005) (citing *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996) ("We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved.")).  The "only question" is whether the search is objectively justifiable under an exception to the Fourth Amendment's warrant requirement.  *Riley v. City of Montgomery, Ala.*, 104 F.3d 1247, 1252 (11th Cir. 1997).

Onyekaba attempts to invoke the Supreme Court's recent decision in *Bailey v. United States*, —— U.S. ——, 133 S. Ct. 1031, 185 L. Ed. 2d 19 (2013), as

7

standing for the proposition that the officers should have arrested Adigun when they had opportunities earlier in the day, rather than waiting until Onyekaba picked her up in the Navigator.  However, *Bailey* does not require officers to arrest a suspect at their first opportunity.  Instead, the *Bailey* Court determined that the rule announced in *Michigan v. Summers*, 452 U.S. 692, 101 S. Ct. 2587 (1981)—which permits officers executing a search warrant to detain the occupants of the premises while a search is conducted—does not apply beyond the immediate vicinity of the premises being searched.  —— U.S. at ——, 133 S. Ct. at 1042.  Accordingly, "[o]nce an individual has left the immediate vicinity of a premises to be searched, . . . detentions must be justified by some . . . rationale" other than the *Summers* rule.  *Id.* at ——, 133 S. Ct. at 1043.  *Bailey* therefore says nothing about when officers may execute an arrest warrant, but rather requires a justification other than the *Summers* rule in situations where officers detain a suspect away from the scene of the search.  Here, there was no detention that occurred away from the immediate vicinity of the search.  As such, *Bailey* is inapposite.

Turning to the second prong of the automobile exception, the defendants assert that the officers did not have probable cause to believe that the Navigator contained contraband or evidence of a crime.  To satisfy the second prong, the government need only show that, "under the totality of the circumstances, there [was] a fair probability that contraband or evidence of a crime [would] be found in

8

the vehicle." *Tamari*, 454 F.3d at 1262 (citations and internal quotation marks omitted). In determining probable cause, we may consider "the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985).

Based on the facts and circumstances known to the officers, there was probable cause for them to believe that the Navigator contained evidence of identity theft and fraud. Before initiating the stop, the officers knew that Adigun was working as a U.S. Postal Service letter carrier under the false identity of "Mary Afolabi", and that several people on her mail route were victims of identity theft. When asked to produce identification during the stop, Adigun produced a driver's license with the name of "Mary Afolabi", the false identity she had been using and the name under which she had endorsed checks drawn on the account of one of the victims, Nancy Mintz. The officers also discovered that the Navigator's license plate was registered to G.M.O. Auto Sales, an automobile dealership for which Adigun served as the registered agent, and the entity to which the checks purportedly issued by Mintz had been directed. Moreover, the officers' lookup of the Navigator's vehicle identification number (VIN) indicated that the registered owner of the vehicle was Mary Afolabi.

9

Additionally, upon initiating the traffic stop by forcing the Navigator to pull over, Detective Guy observed Adigun moving in the vehicle as if she was trying to get rid of something, and he communicated this information to Detective Walden. Then, after Adigun was ordered out of the vehicle and arrested, Detective Guy could see that she had left her purse in the vehicle, and he asked her if she wanted him to retrieve it. When she responded affirmatively and he went to retrieve the purse, he saw an open wallet on the center console with an unusually high number of credit cards, which he recognized as indicative of credit card fraud and identity theft. He also observed that there were "items like pieces of paper" that had been "crumpled" and thrown onto the floorboard on the passenger side. Viewing the facts in the light most favorable to the government, we conclude that the officers' observations of Adigun and the Navigator, combined with their prior knowledge of the fraudulent scheme, gave them probable cause to believe that the Navigator would contain evidence of identity fraud. As such, both prongs of the automobile exception were met, and the search of the Navigator was permissible under the Fourth Amendment.

## B.    Vehicle Search Incident to Arrest

The search was also permissible as a vehicle search incident to arrest under *Gant*. In *Gant*, the Supreme Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance

10

of the passenger compartment at the time of the search *or it is reasonable to believe the vehicle contains evidence of the offense of arrest*."  556 U.S. at 351, 129 S. Ct. at 1723 (emphasis added).  The *Gant* Court did not make clear whether the "reasonable to believe" standard requires a lesser showing than probable cause, and the defendants insist that a vehicle search incident to arrest still requires probable cause.  However, we need not decide the issue now, because we have already explained that the officers had probable cause to believe that the Navigator contained evidence of identity fraud, the crime for which Adigun was arrested.  Accordingly, there is no doubt that it was "reasonable to believe" that the Navigator contained evidence of the offense of arrest, and the search was permissible as a vehicle search incident to arrest under *Gant*.[3]

## II.  SUFFICIENCY OF THE EVIDENCE

We review *de novo* a challenge to the sufficiency of the evidence, considering the evidence in the light most favorable to the government, and drawing all reasonable inferences and credibility choices in the government's favor.  *United States v. Friske*, 640 F.3d 1288, 1290–91 (11th Cir. 2011).  "A jury's verdict cannot be overturned if any reasonable construction of the evidence

---

[3] Because we conclude that the search of the Navigator was permissible under the automobile exception and as a vehicle search incident to arrest, we need not decide whether the search was permissible under the plain view doctrine or because Onyekaba consented to the search. Moreover, because we find that the search was constitutional, we need not address Onyekaba's argument that he had a reasonable expectation of privacy with respect to the items in the Navigator.  We also find Onyekaba's argument that his detention during the traffic stop was unreasonable to be without merit.

11

would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013). "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Capers*, 708 F.3d 1286, 1297 (11th Cir. 2013) (internal quotation marks omitted). "But when the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction." *Id.* (alterations and internal quotation marks omitted).

## A.    Aggravated Identity Theft

Onyekaba contends that there was insufficient evidence to convict him on the aggravated identity theft counts under 18 U.S.C. § 1028A(a)(1). That subsection provides: "Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1).[4] The felonies enumerated in subsection (c) include access device fraud under 18 U.S.C. § 1029(a)(2) and (5), an offense for

---

[4] "Means of identification" is defined as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . name, social security number, date of birth, official State or government issued driver's license or identification number . . . ." 18 U.S.C. § 1028(d)(7).

12

which Onyekaba was charged on multiple counts. *See* 18 U.S.C. § 1028A(c)(4). A conviction for aggravated identity theft requires proof beyond a reasonable doubt that the defendant *knew* that the means of identification at issue belonged to another person. *United States v. Gomez-Castro*, 605 F.3d 1245, 1246 (11th Cir. 2010) (citing *Flores-Figueroa v. United States*, 556 U.S. 646, 657, 129 S. Ct. 1886, 1894 (2009)).

Onyekaba argues that the government provided insufficient evidence that he knew the gift cards he possessed were derived from personal information or account numbers belonging to actual persons. His argument is based upon his assertion that he was indifferent as to the source of the accounts numbers used to purchase the gift cards and the notion that there was no direct evidence showing how the gift cards arrived in his hands. However, we have made clear that, in proving aggravated identity theft, the government may rely on circumstantial evidence as to how the defendant obtained, and later used, the means of identification. *Id.* at 1248–49. Moreover, the Supreme Court has noted that "in the classic case of identity theft, intent is generally not difficult to prove." *Flores-Figueroa*, 556 U.S. at 656, 129 S. Ct. at 1893. "For example, where a defendant has used another person's identification information to get access to that person's bank account, the Government can prove knowledge with little difficulty. The same is true when the defendant has gone through someone else's trash to find

13

discarded credit card and bank statements, or pretends to be from the victim's bank and requests personal identifying information." *Id*.

In this case, the jury heard evidence that many of the victims lived on the mail route of Onyekaba's romantic partner and alleged co-conspirator, Adigun. The evidence showed that Onyekaba was in possession of numerous gift cards that had been purchased with credit cards containing the identity information of the victims, and which the victims denied purchasing themselves. The jury also heard evidence that, on one occasion, Onyekaba was observed sticking his hand into other individuals' mailboxes in the early morning hours, and that he then fled the scene when approached by a resident, leaving a scattering of mail on the ground. Viewing this evidence in the light most favorable to the government, and drawing all reasonable inferences in the government's favor, we have no trouble concluding that a rational jury could find beyond a reasonable doubt that Onyekaba knew that his victims were real people. The jury could reasonably conclude that Onyekaba conspired with Adigun to steal the victims' mail and open accounts in their names. Accordingly, his pleas of ignorance are unavailing.

### B.    Possession of Fifteen or More Unauthorized Access Devices

Onyekaba next challenges the sufficiency of the evidence on his conviction for possession of fifteen or more unauthorized access devices as charged in Count 2. The relevant statute, 18 U.S.C. § 1029(a)(3), makes it unlawful to "knowingly

14

and with intent to defraud possess[ ] fifteen or more devices which are counterfeit or unauthorized access devices."  An "unauthorized access device" is "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud."  18 U.S.C. § 1029(e)(3).  An "access device" is defined as "any card, . . . account number, . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value . . . ."  18 U.S.C. § 1029(e)(1).

Onyekaba argues that there was insufficient evidence that he obtained the gift cards with the intent to defraud because, in his view, the evidence was consistent with him merely receiving the gift cards from other individuals.  We reject this argument for the same reason we expressed with respect to the aggravated identity theft counts.  There was ample evidence for a reasonable jury to conclude that he intended to defraud his victims.

### C.    Mail Theft

Onyekaba challenges his conviction under the mail theft statute, which makes it unlawful to "steal[ ], take[ ], or abstract[ ]" mail "from or out of any . . . letter box, mail receptacle, . . . or other authorized depository for mail matter . . . ."  18 U.S.C. § 1708.  The mail theft charge arose from an incident that occurred at an apartment complex during the early morning hours of May 1, 2009.

15

We find that there was sufficient evidence for a reasonable jury to convict Onyekaba of mail theft.  At trial, Nadine Doyle testified that while sleeping at her apartment at approximately 3:00 a.m. on May 1, 2009, she was awakened by the sound of an idling car and mailboxes opening and closing.  She testified that she looked out the window and saw a car idling next to the mailboxes, so she woke her then-boyfriend (now husband), Michael Doyle, and told him that she thought that someone was stealing mail from the mailboxes.  Michael Doyle corroborated Nadine's testimony and testified that he looked out the window and could see a man opening and closing the mailboxes.  According to Michael, the man then got into the idling car and drove down the street to another set of mailboxes, at which point the man stopped the car, exited, and approached the mailboxes.  Michael then ran out of the apartment, got into his own car, and started to follow the path that the man at the mailboxes had taken.  By the time Michael caught up to the man's car, the man was standing outside the car at a third set of mailboxes.  Michael yelled at the man, who was startled and proceeded to jump into his idling car and quickly drive toward the exit of the apartment complex, squealing his tires in the process.  Shortly thereafter, the man was stopped by Officer Michael Sabens of the Cobb County Police Department and identified as Onyekaba.  Officer Sabens testified that he and other officers then went to the mailboxes where Onyekaba had

16

been observed by Michael Doyle, and they saw pieces of mail scattered on the ground around the mailboxes.

Considering this evidence in the light most favorable to the government, and drawing all reasonable inferences and credibility choices in the government's favor, we believe that the jury reasonably found Onyekaba guilty of mail theft. Onyekaba places considerable weight on the fact that there was inconsistent testimony from Michael Doyle as to whether he observed Onyekaba actually putting his hand into the mailboxes or removing mail from the mailboxes. Because he was never seen holding mail, and because officers did not find Onyekaba to be in possession of any mail, Onyekaba argues that he cannot be convicted of "stealing", "taking", or "abstracting" mail. However, there was sufficient circumstantial evidence for a jury to conclude beyond a reasonable doubt that Onyekaba "took" or "abstracted" mail from the mailboxes, as he was seen and heard by witnesses opening and closing mailboxes, he fled the scene when approached by Doyle, and officers then discovered mail scattered on the ground around the mailboxes. We therefore uphold the conviction for mail theft.

### III.  ADMISSIBILITY OF MACY'S SHOPLIFTING EVIDENCE

In September 2007, loss prevention officers at a Macy's department store stopped Onyekaba after observing him take two watches and put them in his pocket. While searching Onyekaba, the loss prevention officers discovered a third

stolen watch, as well as a driver's license and some credit cards that did not belong to him.  Onyekaba was arrested and then charged in state court with shoplifting, but the charge was dropped after he completed a pretrial intervention program.  However, the credit cards that were discovered in his pockets formed the basis for some of the federal charges against him.  Before trial on the federal charges, Onyekaba filed a motion *in limine* seeking to exclude evidence that he had been arrested for shoplifting the watches, an act for which he was not charged in the federal prosecution.  At a pretrial hearing, the district court denied the motion *in limine*, concluding that the evidence of the shoplifting was admissible to complete the story of how the Macy's loss prevention officers discovered the credit cards on Onyekaba's person.  The government proceeded to introduce the shoplifting evidence at trial.

We review the district court's admission of evidence for abuse of discretion. *Capers*, 708 F.3d at 1305.  "Even where an abuse of discretion is shown, non-constitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." *Id.* (citations and internal quotation marks omitted).  In order for an error to affect substantial rights, the error must have affected the outcome of the district court proceedings. *United States v. Gamory*, 635 F.3d 480, 494 n.15 (11th Cir. 2011).

18

Rule 404(a)(1) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Rule 404(b)(1), meanwhile, provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Onyekaba argues that the Macy's shoplifting evidence was improper "other crimes" evidence that was used by the government to show his "bad character" in violation of Rule 404. He also asserts that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice and that the evidence was therefore inadmissible under Rule 403.

Even if the district court abused its discretion in admitting the evidence, there is not a reasonable likelihood in this case that the admission of the evidence affected the jury's verdict. As we have explained, there was other, overwhelming evidence of Onyekaba's guilt of the access device fraud and aggravated identity theft charges. As a result, any such error would be harmless. *See Gamory*, 635 F.3d at 494 n.15.

## IV.  LOSS AMOUNTS AT SENTENCING

At sentencing, the court adopted the pre-sentence investigation report's ("PSI") findings as to the intended loss of the defendants' fraud scheme and concluded that the intended loss exceeded $400,000. The court therefore applied a

19

14-level increase in each defendant's offense level.  *See* U.S.S.G. §

2B1.1(b)(1)(H).  In calculating intended loss, the court included numerous loans

that it determined the defendants had fraudulently obtained, as well as charges that

the defendants had made to credit cards in the names of other individuals.  The

court also included charges and loan applications that were rejected by the banks

and, importantly, some of the unused credit remaining on the credit cards found in

the defendants' possession.  The court ultimately sentenced Adigun to 100 months'

imprisonment and Onyekaba to 78 months' imprisonment.  Adigun and Onyekaba

now challenge their sentences as procedurally unreasonable based on the court's

calculation of intended loss.

We review the district court's determinations of loss amount for clear error.

*United States v. Nosrati-Shamloo*, 255 F.3d 1290, 1291 (11th Cir. 2001).  Clear

error exists when we are "left with a definite and firm conviction that a mistake has

been committed."  *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir.),

*cert. denied*, 133 S. Ct. 629, 184 L. Ed. 2d 408 (2012) (internal quotation marks

omitted).

When calculating amount of loss under § 2B1.1(b)(1), the applicable amount

of loss is the greater of the actual loss, meaning the reasonably foreseeable

pecuniary harm resulting from the offense, or the intended loss, which is the

pecuniary harm that was intended to result from the offense.  U.S.S.G. §

2B1.1(b)(1) cmt. n.3(A).  When the defendant objects to the PSI loss calculation, the government bears the burden of proving the loss for sentencing.  *Nosrati-Shamloo*, 255 F.3d at 1291.  District courts must make factual findings "sufficient to support the government's claim of the amount of fraud loss attributed to a defendant in a [PSI]."  *United States v. Gupta*, 572 F.3d 878, 888 (11th Cir. 2009) (internal quotation marks omitted).  Failure to make these findings does not merit reversal, however, if the record supports the loss findings.  *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002).  Importantly, the loss calculation does not have to be rigorously precise, only a reasonable estimate given the information available.  *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999).

Onyekaba argues that the district court erred in including in his loss amount $150,000 in loans procured by Adigun from JP Morgan Chase Bank, loans for which only Adigun was charged in the indictment.  And both defendants argue that the district court erred in including the unused credit remaining on the credit cards as intended loss.  Each argument is addressed below.

### A.    Chase Loans

"If a defendant is aware of the scope of a conspiracy outside of his individual actions, he may be held accountable for actions by co-conspirators even though he was not personally involved."  *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1221 (11th Cir. 2010).  Thus, district courts "may hold all participants

in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Dabbs*, 134 F.3d 1071, 1082 (11th Cir. 1998).

In this case, there was ample evidence that Onyekaba was aware of the scope of the conspiracy and that, in fact, he was an active participant in the fraud related to the Chase loans. The Chase loans were obtained using the identities of individuals living in the neighborhood where Onyekaba was seen stealing mail. Additionally, Onyekaba was found in possession of gift cards that were purchased using the identities of individuals who lived on Adigun's mail route, in the same neighborhood as other victims whose identities were used to open the Chase loans. The proceeds from the Chase loans were directed to G.M.O. Auto Sales, the automobile dealership, of which Onyekaba purported to be the president and chief executive officer. When a bank investigator called and visited G.M.O. and inquired about the transactions supposedly made by Nancy Mintz, Onyekaba provided the investigator with fake bills of sale and a fraudulent driver's license. In light of this evidence—and evidence as to the rest of the fraudulent scheme with Adigun—the district court did not clearly err in holding Onyekaba responsible for the Chase loan fraud.

## B.    Unused Credit Limits

22

With respect to the calculation of the amount of intended loss, we have noted that "[a] defendant's intent is often difficult to prove and often must be inferred from circumstantial evidence." *Nosrati-Shamloo*, 255 F.3d at 1292. However, "once a defendant has gained access to a certain credit line by fraudulently applying for credit cards, a district court does not err in determining the amount of the intended loss as the total line of credit to which Defendant could have access, especially when Defendant presents no evidence that he did not intend to utilize all of the credit available on the cards." *Id.* at 1291.

The defendants concede that a total of at least $387,752.04 was correctly included by the district court in the intended loss amount. This sum consists of the funds that were actually lost by the defrauded banks, plus amounts representing credit card charges that were declined and loan applications that were rejected. The district court also included in the loss amount $5,989.14 in charges made to a credit card in the name of Cheryl Paige, and we see no clear error in the court's inclusion of this amount given her testimony at trial.

At issue on appeal is the district court's decision to include, as intended loss, at least some of the untapped credit limits on the credit cards in the defendants' possession, which pushed the intended loss figure above $400,000, thereby resulting in a 14-level increase in each defendant's offense level. The defendants argue that some of the credit cards went unused for over a month, indicating the

23

defendants' supposed abandonment of the cards.  We do not agree that this short period of dormancy as to some of the credit cards is sufficient evidence of the defendants' lack of intent to use the credit remaining on any of the cards.  *See Nosrati-Shamloo*, 255 F.3d at 1292.  The defendants had in their possession credit cards with over $100,000 in unused credit, as well as other cards with no credit limits.  The defendants often approached, reached, or even exceeded the spending limits on the cards they fraudulently obtained.  Given the defendants' pattern of charging the cards, it would be preposterous to say that the intended loss on these cards did not equal at least the small amount necessary to push the intended loss figure above $400,000.  Accordingly, we find no clear error in the district court's decision to include some of the unused credit remaining on the credit cards as intended loss.

## V.  CONCLUSION

Based on our careful review of the record, we affirm the defendants' convictions and sentences.

**AFFIRMED.**